**SO ORDERED.**

**SIGNED June 20, 2019.**



_____
**JOHN W. KOLWE
UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| In re: <br> Louisiana Pellets, Inc., et al. <br> *Debtors* | Case No. 16-80162 <br> (Jointly Administered) |
| Craig Jalbert, Chapter 11 Liquidating Trustee, <br> *Plaintiff* <br><br> v. <br><br> Wessel GmbH, <br> *Defendant* | Chapter 11 <br><br> Judge John W. Kolwe <br><br> Adv. Proc. No. 18-5015 |

### RULING FOLLOWING TRIAL

In this case, the Trustee seeks to recover payments totaling approximately €1,200,000.00 made by the Debtor, German Pellets Louisiana, LLC (or its parent company), to the Defendant, Wessel GmbH. The Trustee contends that the payments constitute constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) because they were made while the Debtor was insolvent and provided the Debtor with less than "reasonably equivalent value" for what was paid. Alternatively (or in addition), the Trustee asserts that under the Louisiana revocatory action, made applicable via 11 U.S.C. § 544(b), the transfers should be avoided, and the payments recovered,

because the transfers caused or increased the Debtor's insolvency. The Court held a trial on April 12, 2019 and took the case under advisement. For the reasons set out below, the Court concludes that the Debtor received "reasonably equivalent value," precluding the finding of a constructive fraudulent transfer under § 548(a)(1)(B), and that the payments were made on an antecedent debt, precluding a Louisiana revocatory action via § 544(b). Accordingly, the Court will enter a judgment in favor of Wessel and against the Trustee.[1]

## Background

The Debtor planned to operate a wood pellet manufacturing facility in Urania, Louisiana, the construction of which was to be completed in two phases. The first phase was successfully built and commenced operations, but the Debtor filed for bankruptcy before the second phase could be completed. The Chapter 11 Liquidating Trustee brought adversary proceedings against a number of contractors, including Wessel, to recover payments the Debtor made toward construction of the doomed second phase.

With respect to this case, the Debtor and Wessel entered into a Purchase and Installation Contract (the "Contract") on January 21, 2013, for Wessel to provide conveying and cooling equipment and render installation and technical services related to both phases of the construction project. The Contract established similar terms for both phases, providing that the Debtor would make milestone payments to Wessel, some tied to calendar dates and some tied to certain other defined criteria. Wessel would receive the final 10% milestone payment for each phase only upon delivery and installation of the equipment in question. As noted, Phase I was completed without incident and began production of the wood pellets.

On February 11, 2014, the Debtor and Wessel executed a Change Order, modifying the Contract so that Phase II would not go forward unless and until the Debtor notified Wessel of its intent to do so. On April 16, 2015, the parties entered

---

[1] The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper under 28 U.S.C. § 1409.

2

into a second Change Order which directed Wessel to proceed with work on part of Phase II, referred to by the parties as "Line B1." Prior to the April 2015 Change Order, Wessel issued an invoice to the Debtor for anticipated work on Phase II in the amount of €200,000.00, which the Debtor paid on December 2, 2014. The remainder of the Line B1 payments were made by German Pellets GmbH, a non-Debtor affiliate or parent of the Debtor.

Although Phase II was never completed, the evidence introduced at trial, including the testimony of Detlef Trosiner, Wessel's project manager, established that Wessel actually commenced work on Line B1 of Phase II of the project. Specifically, Mr. Trosiner testified that the Debtor's proposed facility was much larger than European wood pellet processing facilities and consequently required additional design work, which Wessel performed. Additional design work was required of Wessel when Phase II was further changed to Line B1. The evidence shows that Wessel began construction of the equipment necessary for Line B1, but the Debtor filed for bankruptcy before any substantial work had been conducted on Phase II at the Urania facility, and thus Wessel never delivered any of the equipment. Notably, under the terms of the Contract, Wessel was not obligated to deliver any of the equipment because the Debtor stopped paying Wessel.

The Trustee eventually brought this adversary proceeding, asserting a number of theories. Pursuant to a pretrial stipulation, the only remaining triable claims are:

- whether the payments made by the Debtor and/or German Pellets GmbH to Wessel in connection with Phase II are avoidable constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B); and
- whether the payments are avoidable under non-bankruptcy law pursuant to 11 U.S.C. § 544(b), specifically whether the payments caused or increased the Debtor's insolvency sufficient to support a Louisiana revocatory action.

Wessel filed a comprehensive motion for summary judgment, which the Court heard on the morning of trial. Although there appeared to be good grounds for summary judgment, the Court deferred ruling and instead held the trial, based in part on the fact that Mr. Trosiner had traveled from Germany to testify, and there

3

would be only one additional witness, a forensic accountant, who testified about the source of the payments to Wessel. At the close of trial, the Court took the case under advisement.

## Analysis

### Constructive Fraudulent Transfer Claim

With respect to constructive fraudulent transfers, § 548(a)(1)(B) provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation" and at least one other condition is met, including the Debtor's being insolvent on the date of the transfer or becoming insolvent as a result of the transfer. If the Debtor received "reasonably equivalent value," then the transfer is not avoidable under the plain terms of § 548(a)(1)(B), regardless of whether any other criterion is met.[2]

In *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747 (Bankr. W.D. La. 2013), this Court held that payments on an antecedent debt constitute "reasonably equivalent value" so as to preclude a constructive fraudulent transfer claim. In that case, the Trustee challenged certain payments totaling more than $1.5 million in management fees and expense reimbursements under two agreements. This Court held that because the payments were owed under the existing agreements, the Trustee could not prevail on a constructive fraudulent transfer claim under § 548:

> The Trustee's argument with respect to avoiding these payments as constructive fraudulent transfers runs into the immediate problem that the payments were made to satisfy an antecedent debt—the contractual obligations imposed by the CSA and PSA. By definition, Gulf Fleet received reasonably equivalent value from the satisfaction of its contractual obligations under these agreements. 11

---

[2] Consequently, because the Court concludes that the Debtor received "reasonably equivalent value," the forensic accountant's testimony concerning the source of the payments, which pertains only to other elements of the statute, is irrelevant.

4

U.S.C. § 548(d)(2)(A) (defining "value" to include the "satisfaction or securing of a present or antecedent debt of the debtor.") Given the definition of value in section 548, courts have uniformly held that such payments are not avoidable as constructively fraudulent transfers. *See, e.g., In re Southeast Waffles, LLC,* 702 F.3d 850 (6th Cir. 2012) ("A dollar-for-dollar reduction in debt constitutes-as a matter of law-reasonably equivalent value...."); *In re Sharp Intern. Corp.,* 403 F.3d 43 (2d Cir. 2005) (conveyance that satisfies an antecedent debt is not a fraudulent conveyance); *In re Elrod Holdings Corp.,* 421 B.R. 700 (Bankr. D. Del. 2010); *In re IFS Financial Corp.,* 417 B.R. 419, 441–42 (Bankr. S. D. Tex. 2009) (under relevant fraudulent conveyance law, "value" includes satisfaction of an antecedent debt); *In re Central Ill. Energy Co–op. v. Camille's of Canton, Inc.,* 2011 WL 3666611, at *4 (Bankr. C. D. Ill. Aug. 22, 2011) (debtor's payment toward contractual obligations "discharged that liability and could not have been fraudulent...."). Here, the PSA and CSA defined and fixed Gulf Fleet's obligation to pay specific lump sum management fees of approximately $500,000 per year as well as other fees, expense reimbursements, and commissions. (Complaint at ¶ 33). As a result, the Trustee cannot avoid these individual payments as constructive fraudulent transfers under section 548 based on the facts pled in the Complaint.[3]

The Trustee argues in this case that the existence of an antecedent debt does not, as a matter of law, preclude a finding that the Debtor failed to receive "reasonably equivalent value" because it ultimately received none of the Line B1 equipment when Phase II of the project failed. Even if the payment were not on an antecedent debt, however, case law is clear that a debtor can receive "reasonably equivalent value" even when that debtor fails to receive the full benefit of the contract. For example, in *In re Fairchild Aircraft Corp.*,[4] the debtor aircraft manufacturer had paid a creditor airline $432,380.91 for fuel as well as $3.65MM as advances, which it wrote off as uncollectible, to keep the airline afloat. The Trustee, Whyte, sought to unwind the

---

[3] 491 B.R. at 766.
[4] 6 F.3d 1119 (5th Cir. 1993) (abrogated on other grounds concerning the applicable standard of review in *In re Dunham*, 110 F.3d 286 (5th Cir. 1997)).

5

advances as fraudulent transfers under § 548, but the Fifth Circuit rejected the argument:

> Finally, we note that Whyte's attempt to foreclose inquiry into the value derived from Air Kentucky's continued operation is misguided. According to Whyte, the only value that can be considered is property actually received. Under this view the value of an investment—no matter how large and how probable the potential return—cannot be considered unless it actually pays off, and only to the extent that it does so. Under such a postulation, anyone who provides, deals with, or invests in an entity in financial straits would be doing so at his or her peril under § 548; which means, of course, that few would be likely to do so.
>
> The narrow "realized property" approach to value advanced by Whyte finds no approbation in the law. Rather, the recognized test is whether the investment conferred an economic benefit on the debtor; which benefit is appropriately valued as of the time the investment was made. Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises, the increase in a credit line, and the increased monetary "float" resulting from guaranteeing the loans of another, as constituting value received under § 548. We conclude that, when viewed within the appropriate frame of reference, the benefits flowing to Fairchild from keeping Air Kentucky in operation is likewise value for purposes of § 548. And, as discussed above, we also conclude that, for purposes of § 548, the value realized by Fairchild for fuel payments made while Air Kentucky was still flying was sufficient to constitute reasonably equivalent value.[5]

In other words, payments under a contract may constitute "reasonably equivalent value" based on the expected future benefit, notwithstanding the fact that the Debtor may go into bankruptcy before that benefit is realized. This point is further illustrated in *In re Treasure Valley Opportunities, Inc.*, 166 B.R. 701 (Bankr. D. Idaho 1994), in which the court found that the debtor's payments made to a builder pursuant to a contract for the construction of a wood pellet production plant were for

---

[5] 6 F.3d at 1126–27 (footnotes omitted).

6

"reasonably equivalent value" even though the debtor "received virtually nothing" from the builder, NRR, by the time the debtor declared bankruptcy. The court explained that although the debtor did not end up receiving the plant as anticipated, "[i]n making the payments to NRR, the debtor obtained two benefits: (1) discharge of the obligation to pay NRR under the contract terms; and (2) property in the form of the continued vitality of the contract."[6] Notably, the court considered not just the discharge of past debt, but also the fact that if the debtor had *not* made the payments, the contract would have terminated, and the debtor would not have any chance of the contractor building the plant.

In this case, the Court finds that the 2013 Purchase and Installation Contract between the Debtor and Wessel is a valid and binding contract which was intended to benefit both parties: for the Debtor, construction of both phases of the Urania facility, and for Wessel, payment. Both phases were subject to similar terms, and Phase I was successfully completed pursuant to those terms. Although the Debtor could have chosen to not proceed with Phase II pursuant to the first Change Order, once the Debtor did choose to proceed under the second Change Order, both the Debtor and Wessel were obligated to carry out the Contract as agreed. The Debtor did so by making the necessary payments (or causing its parent company to pay them), and Wessel did so by commencing work on Line B1 of Phase II, including not only design and planning work but also beginning to construct the necessary equipment. Had the Debtor failed to pay Wessel and thereby breached the Contract, Wessel would have been able to walk away from it, putting the completion of the entire facility in peril.

The Court concludes that the payments the Debtor made on the Contract were made to satisfy an antecedent debt. Furthermore, the Court concludes that the Debtor received "reasonably equivalent value" in the form of the expected future benefit of Phase II, notwithstanding the fact that the Debtor's bankruptcy resulted in work stopping and the project ultimately failing. This Court need not address

---

[6] 166 B.R. at 704.

whether there are any circumstances in which payment on an antecedent debt would not constitute "reasonably equivalent value" because this case is not close to any such line. Because the Court finds that the Debtor received "reasonably equivalent value" for its payments to Wessel, the Trustee cannot prevail on the constructive fraudulent transfer claim under § 548(a)(1)(B).

Louisiana Revocatory Action and § 544(b)

The Louisiana revocatory action on which the Trustee's § 544(b) claim rests is found in La. Civ. Code art. 2036, which provides: "An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency." In *Gulf Fleet*, after concluding that payment on an antecedent debt cannot support a constructive fraudulent transfer claim under § 548(a)(1)(B), this Court held that such payments also cannot support a Louisiana revocatory action:

> Nor can these allegations support a claim under section 544 based on Louisiana law. A revocatory action under Civil Code article 2036 requires that the Trustee plead and prove that the payments at issue "caused" or "increased" Gulf Fleet's insolvency. La. Civ. Code art. 2036. While the Complaint alleges that Gulf Fleet was insolvent at the time of these payments, it does not plead facts showing that the payments increased insolvency. Rather, on its face, the Complaint merely shows payments in satisfaction of an antecedent debt which, by definition, would not have increased Gulf Fleet's insolvency.[7]

The same holds true here. The Court has already found that the Contract was valid and binding, and that the payments made thereunder were payments on an antecedent debt. By definition, the already owed payments did not increase the Debtor's insolvency, so they cannot support a Louisiana revocatory action or, by extension, the Trustee's § 544(b) claim.

---

[7] 491 B.R. at 766-67.

## Conclusion

For the above reasons, the Court will enter a judgment in favor of the Defendant, Wessel GmbH, and against the Plaintiff, Craig Jalbert, Chapter 11 Liquidating Trustee.

###